NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**NATIONAL STEEL CAR LTD.,**
*Plaintiff-Appellant*

**v.**

**GREENBRIER-CONCARRIL LLC, GREENBRIER LEASING COMPANY, LLC, GREENBRIER-GIMSA, LLC,**
*Defendants-Appellees*

---

2024-1453

---

Appeal from the United States District Court for the District of Oregon in No. 3:20-cv-01275-YY, Magistrate Judge Youlee Yim You.

---

Decided: November 19, 2025

---

CRAIG D. LEAVELL, Barnes & Thornburg LLP, Chicago, IL, argued for plaintiff-appellant. Also represented by MEGAN M. NEW; LAUREN ULRICH BAKER, ANNA WHITACRE, Atlanta, GA; DANIEL A. VALENZUELA, Dallas, TX.

JONATHAN PIETER VAN ES, Banner & Witcoff, Ltd., Chicago, IL, argued for defendants-appellees. Also represented by BRIAN APEL, MARC COOPERMAN, JANICE V. MITRIUS.

---

Before MOORE, *Chief Judge*, CHEN, *Circuit Judge*, and ANDREWS, *District Judge*.[1]

ANDREWS, *District Judge*.

Plaintiff National Steel Car (NSC) appeals the United States District Court for the District of Oregon's grant of summary judgment of non-infringement of U.S. Patent Numbers 7,434,519 ('519 patent) and 7,878,125 ('125 patent). We *affirm*.

## I. BACKGROUND

NSC owns the '519 patent and the '125 patent. These patents cover the designs of railroad gondolas, open-topped railroad cars used to transport bulk materials, with a unibody design. J.A. 7–10. NSC sued Greenbrier-Concarril, Greenbrier Leasing Company, and Greenbrier-Gimsa (Greenbrier) for infringement of nineteen claims between the '519 patent and the '125 patent.[2] J.A. 10.

Claim 22 of the '519 patent is representative of the asserted claims for each patent. Claim 22 reads:

> 22. A rail road gondola car comprising: a gondola car body carried by railroad car trucks for rolling motion along rail road tracks; said gondola car body having a longitudinal centerline; said gondola car body having a *floor* and a wall structure standing upwardly of said

---

[1]    Honorable Richard G. Andrews, District Judge, United States District Court for the District of Delaware, sitting by designation.

[2] NSC alleges that four of Greenbrier's railroad cars infringed claims 2–4, 8, 9, 11, 13–15, 18, 19, and 22–24 of the '519 patent, and claims 1, 15, 16, 18, and 19 of the '125 patent. J.A. 10.

*floor*, said *floor* and said wall structure defining a lading receptacle; said gondola car body including a pair of lengthwise running side beams, said side beams defining portions of said wall structure; said side beams each having an upper margin, and a longitudinally running shear web member extending predominantly downwardly of said upper margin; said *floor* including at least one *floor panel*; *said at least one floor panel and said shear web member being directly mated together*; a centersill; said [centersill] has a pair of spaced apart webs extending downwardly from said at least one *floor panel*, said webs each have an upper margin mated to said at least one floor panel; said gondola car includes at least one cross-bearer, said at least one cross-bearer has at least one web, *said web of said at least one cross-bearer has an upper margin mated directly to said at least one floor panel*; and said at least one *floor panel* defines an upper flange of said centersill and said at least one cross-bearer, and a bottom flange of at least one of said side beams.

'519 patent, col. 42, l. 54 – col. 43, l. 14 (emphasis added). Each asserted claim requires that some part of the "side

wall web"[3] be in physical contact[4] with the "floor panel" or "deck" of the car. J.A. 11. The parties agreed that the terms "floor panel," as used in the '519 patent, and "deck," used in the '125 patent, should be construed the same.[5]

After briefing and argument, the District Court construed "floor panel" as "floor sheet, or floor sheets joined together, that may have one or more integral floor extensions." J.A. 45–48.

Both parties filed motions seeking reconsideration and clarification of the claim construction. J.A. 28; J.A. 2491–96 (NSC's motion); J.A. 2497–503 (Greenbrier's motion). The District Court denied Greenbrier's request to specify that the floor panel extensions must be "abutting" the floor panel sheet or another floor panel. J.A. 30–32. NSC's motion urged the court to construe "floor panel" in a way that

---

[3] The asserted claims use "shear web member," '519 patent, claim 22, "upstanding web," '125 patent, claim 1, and "side wall web," '125 patent, claim 18. After NSC identified each of these three terms as satisfying the claim limitations, Greenbrier began referring to all three terms as "side wall web." J.A. 2565 n.2. In its summary judgment opinion, the court used "side wall web" to refer to all three terms as well. J.A. 11. As the parties do not dispute the use of "side wall web" to refer to all three terms, we too use "side wall web" to encompass all three claim terms.

[4] Although the wording in each asserted claim is slightly different, the parties agree that each claim requires "that some part of the 'side web wall' of the car is in physical contact with the 'floor panel' or 'deck' of the car." J.A. 11 (citing J.A. 2565 (Def. Mot. Summ. J.) and J.A. 10012–14 (Pl. Resp.)).

[5] The parties agreed that "floor panel" and "deck" should be construed to have the same meaning. The parties often used "floor panel" to refer to both terms. We do too.

would permit the floor panel extensions to be "separate" from the floor sheets or other floor panel extensions. J.A. 2493–94. The court granted NSC's motion. J.A. 28–32.

In its reconsideration and clarification opinion, the court followed NSC's proposed construction and construed the term as: "A 'deck' or 'floor panel' can be one sheet, or a plurality of sheets joined together, and may also include one or more extensions, which may be integral, or which can be separate."[6] J.A. 32. The court explained that nothing requires the floor sheets and/or extensions to be "abutting." J.A. 30–31. The court recognized that its previous construction left "out the possibility that an extension may be separate from the floor panel, which certainly was not what the court intended." J.A. 32.

Greenbrier moved for summary judgment of non-infringement.

One issue at summary judgment involved "side post gussets." J.A. 18–21. A side post gusset is a small horizontal steel plate "located outside the lading container, or outboard of the side wall." J.A. 18–20. As established during summary judgment and confirmed during oral arguments, "the side post gussets do not physically contact the 'floor sheets' or 'floor panel' because of the intervening 'side still.'" J.A. 19. Greenbrier argued the side post gussets are not "floor extensions" because the gussets do not touch the floor sheet. J.A. 20. NSC argued the side post gussets are floor extensions because the claim construction contemplates "one or more extensions, which may be integral, *or which can be separate.*" J.A. 20–21, 32. Greenbrier

---

[6] NSC's proposal used the word "piece" rather than "sheet" to describe what the floor was made of. J.A. 29. The court determined that "sheet," a more specific term describing the material, accurately described the patent's claims. J.A. 29–30.

disagreed and asked the court to exclude NSC's interpretation and to require the floor extensions to physically touch the floor panel or another floor panel extension. J.A. 14–15.

A second issue at summary judgment was whether the construction of "floor panel" allowed "floor extensions" or if the claim was limited to "floor *panel* extensions." J.A. 21–25. NSC argued the claim construction should include "floor extensions" without the limitation, and Greenbrier argued that the claim was limited to floor panel extensions. J.A. 21–23. The court took supplemental briefing on "the effect of the court's previous claim construction orders on defendants'" summary judgment motion. J.A. 11. The parties fully briefed summary judgment and the court held multiple days of oral argument.

The court granted summary judgment of non-infringement. J.A. 27. In its summary judgment opinion, the court explained that it had adopted the term "separate" to make it clear that the claim construction did not require "abutting" pieces; it did not adopt "separate" to mean "not touching." J.A. 21. The court then clarified that the construction of "floor panel" requires a "floor panel extension" to physically touch the floor panel. J.A. 21–24. After making these clarifications, the court explained that the side post gusset was not a floor panel extension because it did not touch the floor panel. J.A. 25. This finding is dispositive of all infringement claims because each of NSC's asserted claims require that some part of the "side wall web" physically contact the floor panel. J.A. 20. The side wall webbing in Greenbrier's accused cars is not connected directly to the floor panel. J.A. 18. Instead, Greenbrier's accused cars use the side post gussets to support vertical "side posts" to which the "side wall webbing" is connected. J.A. 18–19. Thus, there was no dispute of fact that Greenbrier's cars did not infringe the '519 or '125 patents as construed by the court.

NSC timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II. LEGAL STANDARD

We review matters not unique to patent law according to the law of the regional circuit, here the Ninth Circuit. *MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1376 (Fed. Cir. 2016). The Ninth Circuit reviews a grant of summary judgment de novo. *Id.* (citing *Greater Yellowstone Coalition v. Lewis*, 628 F.3d 1143, 1148 (9th Cir. 2010)). Summary judgment is properly granted only when, drawing all reasonable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57 (1986).

A court makes a two-part inquiry to determine whether to grant summary judgment of non-infringement. *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016). "[F]irst, a court construes the scope and meaning of the asserted patent claims." *Id.* Then it "compares the construed claims to the accused product or process." *Id.* "We review claim construction based on intrinsic evidence de novo and review any findings of fact regarding extrinsic evidence for clear error." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1378 (Fed. Cir. 2021).

The Ninth Circuit reviews the denial of a motion for reconsideration for an abuse of discretion. *Pasatiempo ex rel. Pasatiempo v. Aizawa*, 103 F.3d 796, 801 (9th Cir. 1996). A motion to reconsider "should not be granted, absent highly unusual circumstances," and "may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enterprises., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (internal citations omitted).

### III. DISCUSSION

NSC argues that the court erred by granting summary judgment of non-infringement. NSC asserts two errors. One, that the court "reinterpreted" its construction of "floor panel" to require that an "extension" be a "floor panel extension." Appellant Opening Br. at 26–32. Two, that the court required that the floor panel extension touch the floor panel. *Id.* at 26–27, 32–38. NSC argues that, in the absence of the "reinterpretation," it had two theories under which Greenbrier infringed. *Id.* at 38–44.[7] NSC argues that, even with the "reinterpretation," the court should not have granted summary judgment of non-infringement. *Id.* at 44–47. Even if the court's "reinterpretation" was correct, NSC argues that at the least we should remand the case to afford NSC an opportunity to assert infringement under the "new" construction. *Id.* at 48–51.

Greenbrier responds by arguing that the court's claim construction was correct. Appellee Resp. Br. at 49–58. Greenbrier argues that summary judgment was appropriate under the court's construction and would be appropriate even if one of NSC's claim construction arguments succeeds. *Id.* at 59–68, 71–79. Greenbrier argues that, if the court's summary judgment decision was correct, the

---

[7] NSC's briefing about the two theories reads as an argument that the "reinterpretation" makes a difference to the outcome of the infringement analysis. In other words, NSC has an infringement case if its understandings of the disputed claim constructions are correct. The heading of the relevant section of the briefing is, "Greenbrier infringes under an appropriate construction." Appellant Opening Br. at 38. The section concludes with, "Greenbrier infringes . . . under a proper construction . . . ." *Id.* at 44. Since we do not agree with NSC's claim construction arguments, we do not need to reach the arguments in this section of the briefing.

case should not be remanded because the court followed all procedural requirements.  *Id.* at 68–70, 80–83.[8]

### A. Summary Judgment of Non-Infringement

NSC argues that, with "proper" claim construction, there are two theories under which Greenbrier infringes. Appellant Opening Br. at 38–47.  In the alternative, NSC argues there are genuine questions of material fact whether Greenbrier infringes the asserted patents.  *Id.* These two theories depend on the claim construction of "floor panel."

### 1. Claim Construction

### a. Use of Extrinsic Evidence

The parties dispute whether the court relied on extrinsic evidence or not, Appellant Opening Br. at 25; Appellee Resp. Br. at 37, a dispute that is relevant for determining this Court's standard of review.  *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).  The court referenced two pieces of extrinsic evidence while construing "floor panel," but the court did not rely on either piece.

First, the court discussed the expert testimony of one of Greenbrier's experts.  J.A. 47.  NSC cited this testimony in its claim construction reply brief to argue that a "floor panel" may be made of wood and thus, NSC argued, the construction of "floor panel" should not be limited to "sheets."  *Id.* (citing J.A. 1056).  The court determined that "sheet" was consistent with the intrinsic evidence and

---

[8] Greenbrier also argues its position with an invited error argument, Appellee Resp. Br. at 40–42, and a series of waiver arguments, *id.* at 42–49.  In light of our resolution of the claim construction disputes, we do not need to address these arguments.

disregarded NSC's arguments based on extrinsic evidence. *Id.* This was simply a reference to extrinsic evidence—it was not an instance where the court made a factual finding based on extrinsic evidence.

Second, the court cited a dictionary definition for the word "weld." J.A. 47. This definition was used as additional support for the court's response to NSC's argument regarding Greenbrier's expert's testimony about the possibility of wooden floor material. *Id.* Unlike the reference to the discounted expert testimony, the court did use this definition to set forth the meaning of "weld." It was not construing "weld," but it did use its understanding of "weld" in connection with construing "floor panel." *Id.* In its opinion clarifying or reconsidering the construction of "floor panel," the court cited this definition of "weld" again. J.A. 29–30. The court used the definition to further explain its initial construction. At most, the definition was used to provide a clear understanding of the word "weld." There is no claim that it was an erroneous finding of fact. To the extent it involved a subsidiary finding of fact, it was not clearly erroneous.

Every aspect of the claim construction other than the use of a dictionary to define "weld" was solely based on intrinsic evidence. Aside from determining the material of the "floor panel," a portion of the claim construction that is not in dispute, the intrinsic evidence used throughout the rest of the court's construction did not rely on the definition of weld.

Thus, this Court must review the claim construction de novo.

### b. Construction of "Floor Panel"

Neither party challenges the court's revised claim construction of "floor panel" to be "one sheet, or a plurality of sheets joined together, and may include one or more

extensions, which may be integral, or which can be separate." J.A. 32.  We agree with the district court's construction.

The specifications of the patents state that the flooring of the rail car may include a "floor panel[,] which may be made of a plurality of floor sheets joined together, in an abutting fashion such as may yield a continuous lading containing surface, or, in one embodiment, may be made from a single, monolithic steel sheet." '519 patent, col. 9, ll. 14–18; '125 patent, col. 9, ll. 20–24.  The floor panel "may include floor panel extensions . . . .  Extensions . . . may be formed by trimming the floor panel stock, such that extensions . . . are integral parts of [the] floor panel . . ., rather than being joined after-the-fact as gussets welded in place." '519 patent, col. 14, ll. 40–44; '125 patent, col. 14, ll. 48–52.  As the court pointed out, this permissive wording allows the extensions to abut the floor panel, but it does not require that they do so.  Thus, the district court's construction allowing the extensions to "be integral, or [to] be separate" is correct.

### i. "floor panel extension"

NSC argues that the court erred by "reinterpret[ing]" its construction of "floor panel" in the summary judgment ruling.  This "reinterpretation," NSC argues, created a new limitation that narrowed the scope of an "extension" from a "floor extension" to a "floor *panel* extension."  Appellant Opening Br. at 28–29.  NSC cites examples from the court's earlier constructions and from the parties' briefing which used the phrase "floor extension" rather than "floor panel extension." *Id.* at 29–30.  NSC argues that these references demonstrate the phrase had previously been understood by the court and parties to include any floor extensions without the limitation that an extension be a floor *panel* extension. *Id.*

The court did not reconstrue the claim.  Nor did the court "reinterpret[]" its prior construction to impose a new limitation.  "Extension" is not a claim term; it is a phrase within the construction of the claim term "floor panel."  J.A. 29–32, 45–48.  When the court was construing "floor panel," it was not construing "floor."  J.A. 29–32, 45–48.  Thus, the "extension" is not an extension of the floor; it is an extension of the floor panel.  That is, the extension is a floor panel extension.  The court's construction did not expressly modify "extension" with either "floor" or "floor panel." It was understood, or should have been understood, that the extension referred to the term being construed and not to some other term that was not being construed.  The court did not improperly add a limitation into the claim construction at summary judgment.  The court correctly determined that an "extension" must be a "floor panel extension."

### ii. "separate"

NSC argues that the court erred by "reinterpret[ing]" the phrase "separate" such that it required a floor panel extension to touch the floor panel.  Appellant Opening Br. at 32.  Like the dispute over "extension," this is not a matter of claim construction or even reinterpretation of a term within a construction.

The import of the word "separate" in the "floor panel" construction was clear.  It was that the floor panel extension did not have to be "integral."  To understand why this is so, it is necessary to review the history of the parties' dispute over the construction of "floor panel."

In their initial proposed claim constructions, both parties required that the sheets be "joined together." NSC proposed that "floor panel" be construed as "one piece, or a plurality of pieces joined together, and may also include one or more extensions, which may be integral, or which may be separate." Greenbrier proposed that the term be

construed as "floor sheet, or abutting floor sheets joined together, that may have one or more integral or abutting floor extensions." J.A. 45.

The parties simply disagreed on *how* the sheets must be joined. *Id.* During the claim construction hearing, NSC argued against using the word "abutting" because it would require that the sheets be arranged "end-to-end," with a butt joint or butt weld, and would exclude other sheets that were combined with a lap joint or were otherwise overlapping. J.A. 16. The dispute around "abutting" was not a dispute over *if* the sheets must touch or join; it was a dispute over *how* the sheets must touch or be joined. To resolve the dispute, the court removed the word "abutting" to allow for sheets that were joined by an overlapping connection rather than limiting the claim to floor panel extensions that were joined with an end-to-end connection. Thus, the court's first construction was that a "floor panel" was a "floor sheet, or floor sheets joined together, that may have one or more integral floor extensions." J.A. 32.

On reconsideration, the court acknowledged that the removal of the word "abutting" unintentionally required a sheet to be "integral" to the floor panel for it to qualify as a floor panel extension as initially construed by the court. J.A. 32. Once again, the parties did not dispute whether a sheet must touch the floor panel to be classified as an extension. The question in dispute was whether a sheet must touch the floor panel *in a way that made it integral with the floor panel* for it to meet the definition of a floor panel extension. "Integral" was used by the parties and the court to refer to a floor panel that was either cut from one sheet of steel or was welded to, or otherwise physically combined with, the floor panel to create a continuous and uniform sheet. J.A. 22–23; Appellee Resp. Br. at 50 (citing J.A. 279–80 (NSC's claim construction brief)). Thus, the word "separate" is used to expand the definition of "floor panel extension" to include all sheets that are directly touching the

floor panel regardless of how they are making direct contact.

The use of the word "separate" in the construction is clear even when setting aside the context of the court's analysis. As used in the construction of "floor panel," "separate" follows as an alternative to "integral," such that "separate" essentially means "non-integral." When read overall, the claim requires that the floor panel be made of a single sheet or sheets joined together. Nothing in the claim allows for a floor panel extension to be unconnected to the rest of the floor panel.

### 2. Summary Judgment

On appeal, NSC presents multiple arguments alleging that, under the claim constructions as NSC interprets them, Greenbrier either infringed or there are genuine questions of material fact that preclude summary judgment. Appellant Opening Br. at 38–47. Having rejected NSC's interpretations of the claim constructions, these arguments fail. Under the proper claim construction, there is no dispute that the side post gussets do not directly contact the floor panel. Each of NSC's asserted claims require that some part of the car's "side wall web" physically contact the floor panel. J.A. 20. The parties do not dispute that the side wall web of each of Greenbrier's accused cars is connected to the side posts, which are supported by the side post gussets. *Id.* The side wall web is not directly "mated" to the floor panel, as required by the asserted claims. J.A. 20, 27. Thus, the court correctly granted summary judgment of non-infringement.

### B. Remand

NSC argues that the summary judgment ruling should be vacated and the case remanded to allow NSC the proper opportunity to assess any new claim constructions and to advance arguments to support its infringement

claim under the new constructions. Appellant Opening Br. at 48–51. NSC notes that it previously sought this opportunity by filing a motion for reconsideration and/or clarification of the summary judgment order, but the court denied NSC's request. *Id.* at 50.

The court did not abuse its discretion in denying NSC's motion for reconsideration and/or clarification. The court explained:

> The analysis of the "side post gusset" of defendants' cars and the terms "floor panel" and "deck" in plaintiff's patents has been extensively litigated including though claim construction briefing and a hearing, a reconsideration of the court's construction of the terms "floor panel" and "deck," a revised claim construction order, briefing on summary judgment, supplemental briefing on this specific issue as ordered by the court, and oral argument on the issue at two different hearings. Both parties have had ample opportunity to be heard on this issue, and plaintiff has not explained why the arguments raised in its currently pending motions could not have been raised earlier, especially in light of the court's previous order requesting supplemental briefing on the precise issue on which it now seeks reconsideration.

J.A. 3. The court elaborated that the summary judgment order "explained in detail the reason underlying the court's construction of the claim terms." J.A. 4. The court found that further explanation was "not necessary," particularly as NSC had not "identified which parts of the court's order is in need of clarification." *Id.* It was not an abuse of discretion for the court to deny NSC's motion for reconsideration and/or clarification.

This is not a case where the court granted summary judgment sua sponte. Nor is this a case where there was limited discovery prior to the summary judgment motion. Both parties fully briefed and argued their positions throughout the three rounds of claim construction hearings. J.A. 10–11. There were no new constructions after the second round of claim construction hearings. NSC was given plenty of opportunities to defend its infringement claims and was provided more than adequate process throughout this litigation. There are no grounds that warrant remand in this case.

## IV. CONCLUSION

We have considered NSC's arguments and find them unpersuasive. For the foregoing reasons, we affirm.

**AFFIRMED**